The CITY OF NEW YORK, Plaintiff,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Douglas M. Costle as Administrator, United States Environmental Protection Agency, and Charles Warren as Regional Administrator, United States Environmental Protection Agency, Region II, Defendants.

No. 80 Civ. 1677 (ADS).

United States District Court,
S. D. New York.

Aug. 26, 1981.

Allen G. Schwartz, Corp. Counsel of the City of New York; Thomas W. Bergdall, Stephen P. Kramer, Asst. Corporation Counsels, New York City, for plaintiff.

John S. Martin, Jr., U. S. Atty., S. D. N. Y., Peter R. Paden, Gaines Gwathmey, III, Asst. U. S. Attys., New York City, James W. Moorman, Asst. Atty. Gen., Land and Natural Resources Division; Bruce C. Rashkow, Rebecca A. Donnellan, Attys. U. S. Dept. of Justice, Washington, D. C., Diane L. Olsson, E. P. A., Washington, D. C., for defendants.

REVISED OPINION *

SOFAER, District Judge.

The City of New York dumps approximately 260 dry tons of sewage sludge each day into an area of the ocean known as the New York Bight Apex. The material dumped is the product of primary and secondary treatment of the City's sewage at various municipal sewage treatment facilities. The dumping is authorized by an interim permit issued by the Environmental Protection Administration ("EPA"). That permit requires the City to devise and implement an alternative method of disposal by December 31, 1981.

At EPA's behest, the City has developed a two-stage plan for alternative disposal of sewage sludge. As a short-term alternative to ocean dumping, the City proposes to compost the sludge (together with bulking material) and to spread the materials as ground cover and fill on various landsites throughout the City.[1] The supply of such land is limited, however, and the City will

---

* The original opinion in this case was issued on April 14, 1981. Because of the complexity of the issues, the limited scope of materials originally submitted, and omissions from materials submitted at the Court's request, the parties were given several months to propose amendments to the opinion, and the opinion has been revised accordingly.

1. Although the lands dedicated for the disposal are referred to as "parkland," EPA claims that they are in fact likely to be landfills or garbage dumps. The composting facilities may not be operative until some months after the 1981 deadline. The City has therefore developed an emergency plan under which it would store the sludge in lagoons until the composting could begin.

therefore need to implement a long-term alternative by 1988 or 1989. No long-term alternative has yet been devised, although the City's consultants are now preparing recommendations.

The City contends that the adverse consequences and costs of the short-term land disposal scheme greatly exceed the effects of continued dumping in the heavily polluted Bight, and it has urged EPA to renew its interim permit. EPA, however, has refused to hear the City's contentions, and the City has brought this lawsuit to compel EPA to consider its evidence. The agency contends that, in a 1977 amendment of the Marine Protection, Research and Sanctuaries Act of 1972, 33 U.S.C. §§ 1401–1444 (the "Act"), Congress absolutely barred all ocean dumping after December 31, 1981 of sewage sludge found harmful to the marine environment. The City, on the other hand, argues that Congress has barred only that dumping which "unreasonably" degrades the marine environment, and that in determining whether particular dumping is unreasonable, EPA must evaluate the cost and potential hazards of land-based alternatives and the effects of the proposed dumping upon the particular dump site. The City has adduced considerable evidence that its dumping in the Bight has relatively inconsequential effects; that cessation of the dumping would result in no discernible improvement in the Bight in the foreseeable future; that the interim land disposal plan would be extremely costly (over $200 million) and could only be used for about eight years; and that the interim land-based plan poses its own environmental and health hazards, which might later prove to be far more deleterious than the known and potential hazards of the ocean dumping.

EPA concedes that, under the 1972 Act, it was required to consider the relative consequences of ocean and land-based disposal in formulating the criteria by which permits would be issued; but it contends that it was not required to consider those factors in evaluating individual permit applications. The Agency claims that, prior to 1977, it was free to adopt criteria pursuant to which a permit application was automatically de-nied—irrespective of all other considerations—if the particular sludge failed certain bioassay tests. Since 1977, EPA argues, it is *required* to apply the statute in this manner, because in adopting the 1977 amendment, Congress embodied EPA's approach in a statutory command.

■ The language and history of the 1972 Act, however, demonstrate that EPA's interpretation of the statute is wrong. The Act as originally adopted required EPA to consider, in connection with each application for dumping, whether that particular dumping would unreasonably degrade the marine environment in light of a number of factors, including those pressed by the City. EPA could not lawfully adopt a policy of denying all permits without examining and weighing an applicant's evidence that ocean dumping is the most reasonable alternative. The 1977 amendment to the Act provides little support for EPA's present position; it prohibits only unreasonable dumping, without providing any substitute for the definition of "unreasonable" provided in the original statute. Although Congress might be empowered to order an end to all ocean dumping, in this case the amendment is properly construed to prevent the issuance of permits only for dumping that EPA in fact finds is unreasonable. The Agency's conclusive presumption that materials that fail to satisfy the environmental impact criteria will unreasonably degrade the environment is arbitrary and capricious, and not in accordance with the governing statute.

## I. JURISDICTION TO CHALLENGE EPA'S POLICY

A challenge to an agency's refusal to act, standing alone, could pose serious jurisdictional problems. In this case, however, EPA has made clear in its regulations and dealings with the City that it will not grant any type of permit for sludge dumping after December 31, 1981. In October 1979, the City asked EPA for an interim permit with a target date of sometime in the late 1980's for implementing a land-based alternative. Although the City was confident

that it could meet the 1981 deadline, it feared the environmental consequences of the alternative disposal plan. It contended, moreover, that the 1981 deadline should not be applied to the City's sludge, because the volume being dumped did not unreasonably degrade the New York Bight. *See* Affidavit of J. Kevin Healy (General Counsel, New York City Department of Environmental Protection), Exhibit D, at 3–5. On November 1, 1979, the Hearing Officer recommended issuance of an interim permit until December 31, 1981 and suggested that, because the dumping appeared not to degrade the ocean environment unreasonably, a further extension should be granted if necessary. *Id.*, Exhibit E. The EPA Staff objected to the Hearing Officer's recommendation, contending that the Act barred all dumping that failed to comply with the criteria. *Id.*, Exhibit F. On March 13, 1980, without commenting on the City's request for an extension, the Regional Administrator issued an interim permit with a December 31, 1981 deadline.

■ The City again requested an extension of the 1981 deadline on March 24, 1980, in an application for certain technical modifications, and on June 27, 1980 the City petitioned the Administrator to commence proceedings to amend the ocean dumping criteria so that the City could dump beyond the deadline. No action has been taken on the application, and EPA has sought no delay in this litigation to enable it to pass upon the City's petition. At the same time that it brought this suit, the City filed a new application for permission to dump after 1981. EPA has not sought to defer a judicial ruling on the Agency's interpretation, indicating its resolve prior to January 1981 to deny the City's application. *See id.* ¶ 6 ("[EPA] officials have been unanimous in their view that the EPA cannot legally issue an 'interim' ocean dumping permit" for dumping after 1981). Accordingly, the doctrines of primary jurisdiction and exhaustion of administrative remedies do not bar this lawsuit. *See Diapulse Corp. v. FDA*, 500 F.2d 75, 77 (2d Cir. 1974); *Wolff v. Selective Service Local Board No. 16*, 372 F.2d 817, 825 (2d Cir. 1967); *Mobil Oil Corp.*

*v. Department of Energy*, 469 F.Supp. 1119, 1123–24 (S.D.N.Y.1979). Here, as in *Connecticut v. EPA*, 656 F.2d 902 at 905–06 (2d Cir. 1981), "[t]o defer the exercise of our jurisdiction until such time as EPA renders its final decision on those petitions would thus effectively moot this entire dispute."

The only jurisdictional argument made by EPA is its rather casually advanced suggestion that the City should be estopped from challenging the regulations. The City, EPA contends, has had notice of the 1981 deadline since 1977 and has accepted EPA funds to achieve compliance. Furthermore, the City has filed the necessary plans and has indicated that it is ready to comply with the first stage of its planned alternative. This suit, the Agency claims, is a last-minute attempt to delay or thwart a long-term commitment. Defendant's Memorandum at 27 n. *.

■ No basis exists in this case for an estoppel. The City has made no misrepresentations. It has always opposed EPA's interpretation of the 1972 Act. The City did not attack the Agency's regulations prior to this lawsuit because, despite EPA's refusal to issue the City a special permit, the City annually received interim permits. Moreover, as counsel for the City explained at oral argument, the City did not file suit earlier because it genuinely expected to be able to develop acceptable alternatives before the 1981 deadline; the dangers of the composting scheme were not immediately evident and necessitated additional studies. The full cost of the City's first phase only recently became known with accuracy. Data concerning the relative safety with which the City could continue dumping in the near future have become available only within the last few years, and the City contends that the most recent evidence indicates that its dumping has a minimal adverse effect at the approved disposal site. Only recently has it become apparent that an acceptable long-term alternative may presently be unavailable.

EPA has long been aware of the City's opposition to the Agency's interpretation;

it cannot claim to have detrimentally relied upon the City's forbearance from suit. The Agency's only suggestion of injury is that the City has accepted and spent federal funds to implement the disposal program that it now seeks to abandon. According to the responsible EPA official, however, only $6 million in federal grants have been spent for planning and design. Another $25 million have been contractually committed, but not irrevocably.[2] Nearly $180 million in grants are as yet uncommitted. Affidavit of Leonard J. Romino (Chief, Eastern Section, New York Water Programs Branch, EPA Region II). Under these circumstances, the City cannot be estopped on the ground that it has wasted federal funds. The funds already spent enabled the City to appraise its first-phase plan in detail. Although some funds had to be committed early in the planning process, the great bulk of the planned expenditures have not been made. EPA's position—that it would be better to spend at least an additional $180 million, even if that expenditure would be environmentally unsound, than to sacrifice the relatively small amount (at most $31 million) already committed—is untenable and irresponsible. Indeed, literally billions of dollars in public funds are at stake in this litigation, since Westchester and Nassau Counties have suits before this Court concerning the same basic issue presented by the City's complaint.[3] The combined cost, over time, of depriving these three entities of access to the ocean for sludge dumping renders insignificant the funds spent to date in studying alternatives to ocean disposal.

2. Of the five grants awarded to the City, the first two, totalling $6 million, have been spent. The last two, totalling $158 million, have not been committed. The third grant is for $47 million. Of that, $12 million has been spent on centrifuges under construction; some of that money could be recouped by selling the equipment. The City may recently have entered into a $13 million contract for filter presses, but the remaining $21 million of the third grant is uncommitted.

3. The Westchester suit, *United States v. County of Westchester*, 79 Civ. 2186 (ADS), and the

## II. THE 1972 ACT'S PROHIBITION OF UNREASONABLE DUMPING

### A. *The Statutory Language*

Prior to 1972, the United States had no law that comprehensively controlled the dumping of wastes into the ocean. A 1970 report by the Council on Environmental Quality focused public attention on the dangers of unregulated ocean dumping. In response to that concern, Congress adopted the Marine Protection, Research and Sanctuaries Act, Pub.L. 92–532, 86 Stat. 1052 (1972). The stated purpose of the Act is "to prevent or strictly limit the dumping into ocean waters of any material which would adversely affect human health, welfare, or amenities, or the marine environment, ecological systems, or economic potentialities." 33 U.S.C. § 1401(b).

Rather than proscribing all ocean dumping, the Act uses a permit system: dumping is prohibited except as authorized by permit. *Id.* § 1411. The Act authorizes the Administrator of EPA to issue permits for the dumping of nondredged materials "where the Administrator determines that such dumping will not unreasonably degrade or endanger human health, welfare, or amenities, or the marine environment, ecological systems, or economic potentialities." *Id.* § 1412(a).[4]

The test for whether ocean dumping may continue or must cease, therefore, is whether it will unreasonably degrade the marine environment. The decision in individual cases is to be made by the Administrator, but Congress did not grant unfettered discretion in defining the statutory test. The Act requires applications for permits to be

Nassau suit, *County of Nassau v. United States Environmental Protection Agency*, 81 Civ. 2032 (ADS), pose issues similar to those in this suit. But this opinion does not directly address those other actions.

4. Responsibility for issuance of dumping permits for dredged materials is vested in the Secretary of the Army (and derivatively in the Corps of Engineers). 33 U.S.C. § 1413(a). The validity of the regulations that govern dredged materials is not before this Court.

reviewed and evaluated in accordance with criteria based upon all relevant considerations:

[T]he Administrator may issue permits . . . for the dumping of material into the waters described in section 1411(b) of this title, where the Administrator determines that such dumping will not unreasonably degrade or endanger human health, welfare, or amenities, or the marine environment, ecological systems, or economic potentialities. The Administrator shall establish and apply criteria for reviewing and evaluating such permit applications, and, in establishing or revising such criteria, shall consider, but not be limited in his consideration to, the following:

(A) The need for the proposed dumping.

(B) The effect of such dumping on human health and welfare, including economic, esthetic, and recreational values.

(C) The effect of such dumping on fisheries resources, plankton, fish, shellfish, wildlife, shore lines and beaches.

(D) The effect of such dumping on marine ecosystems, particularly with respect to—

(i) the transfer, concentration, and dispersion of such material and its byproducts through biological, physical, and chemical processes,

(ii) potential changes in marine ecosystem diversity, productivity, and stability, and

(iii) species and community population dynamics.

(E) The persistence and permanence of the effects of the dumping.

(F) The effect of dumping particular volumes and concentrations of such materials.

(G) Appropriate locations and methods of disposal or recycling, including land-based alternatives and the probable impact of requiring use of such alternate locations or methods upon considerations affecting the public interest.

(H) The effect on alternate uses of oceans, such as scientific study, fishing, and other living resource exploitation, and nonliving resource exploitation.

(I) In designating recommended sites, the Administrator shall utilize wherever feasible locations beyond the edge of the Continental Shelf.

*Id.* § 1412(a). The controlling language in this section is that, "in establishing or revising" criteria for evaluating permit applications, the Administrator "shall consider, but not be limited in his consideration to, the following [nine factors]." *Id.* This provision is mandatory: the Administrator "shall"—not "may"—consider the enumerated factors.

By its terms, section 1412(a) appears to impose upon EPA a balancing requirement. The section proscribes, not all dumping, but rather only such dumping as unreasonably endangers the environment. The term "reasonable" inherently connotes a weighing of all the relevant circumstances. By enumerating several factors that inevitably conflict—such as the need for dumping and its effect upon the environment—and requiring the Administrator to consider them, the Act forces EPA to balance the statutory factors. *Cf. Industrial Union Department, AFL–CIO v. American Petroleum Institute,* 448 U.S. 607, 667–71, 100 S.Ct. 2844, 2876–79, 65 L.Ed.2d 1010 (1980) (Powell, J., concurring in part); *Appalachian Power Co. v. Train,* 620 F.2d 1040, 1046 (4th Cir. 1980); *D. D. Bean & Sons Co. v. Consumer Product Safety Commission,* 574 F.2d 643, 649 (1st Cir. 1978); *Aqua Slide 'N' Dive Corp. v. Consumer Product Safety Commission,* 569 F.2d 831, 844 (5th Cir. 1978); *Appalachian Power Co. v. Train,* 545 F.2d 1351, 1364 (4th Cir. 1976).

B. *The Legislative History*

The debate over the Act's adoption strongly supports the two propositions suggested by the statutory language: (1) that the Act banned, not all ocean dumping, but only such dumping as on balance is unreasonably harmful; and (2) that EPA must establish criteria that lead the Agency to consider the statutory factors on a case-by-case basis.

With respect to the first proposition, the Senate Report explained:

[A]s emphasized by various professional witnesses from the waste management field, all ocean dumping need not be banned outright. Ocean dumping of selected types of wastes is permissible and may be quite desirable. . . . [As one consultant stated:] "If we can recognize the ocean's ability to accept enormous volumes of waste, then the key decision is simplified. It becomes what type of waste can we put into the sea safely and what must be disposed of elsewhere. . . . There is a need to recognize in the bill that . . . the wastes assimilative capacity of the sea is enormous."

Senate Report No. 92–451, 92d Cong., 1st Sess. (1971), *reprinted in* [1972] U.S.Code Cong. & Ad.News 4234, 4239 [hereinafter cited as 1972 Senate Report].

The legislative history reflects a recognition that some areas of the ocean are well-suited for waste disposal,[5] and that in some cases no appropriate alternatives to ocean dumping would be available.[6] When Congress sought to ban certain types of dumping absolutely, it did so expressly.[7] With respect to other types of material, Congress conditioned the ban on an overall evaluation of the environmental consequences. As Representative Dingell (Chairman of the Subcommittee on Fisheries and Wildlife Conservation and a floor manager of the bill) stated: "Section 102 provides general authority to the Environmental Protection Agency to issue permits . . . where permit applicants show him that the environmental and economic impact of that dumping *will not be unreasonably harmful.*" 117 Cong. Rec. 30,851–52 (1971) (emphasis added). Similarly, Representative Harrington had proposed that the bill ban absolutely "dumping of any material which would damage the environment"; but he conceded that Congress preferred the less stringent standard of "unreasonably degrades." 117 Cong.Rec. 31,155 (1971).

Key legislators viewed the bill as requiring a balancing of competing interests. Representative Garmatz, Chairman of the Committee on Merchant Marine and Fisheries, stated that the bill "attempts to guard against over-reaction to pollution problems by establishing a sensible and essential balance between the need to protect our environment and the need to maintain and promote industrial and economic development." 117 Cong.Rec. 30,856 (1971). *Accord, id.* at 36,045 (remarks of Rep. Downing). Representative Lennon, Chairman of the Subcommittee on Oceanography, after reviewing the statutory criteria in section 1412(a), concluded: "the result is a reasonable balance between the demonstrated needs to protect our marine environment, and the economic needs of our domestic and foreign water commerce." 117 Cong.Rec. 30,857 (1971).

The second proposition that emerges from the legislative history is that EPA

---

5. Senator Hollings, floor manager for the legislation, stated: "[Some] materials are inert or have no known adverse impact on the marine environment. And there are nonproductive areas of the ocean into which they could be dumped without damage. The sea is not uniformly productive. Some areas are more comparable to deserts than to highly productive agricultural lands." 117 Cong.Rec. 43,069 (1971).

6. The Interior Department wrote to the Senate Committee: "[T]his Department has frequently expressed its opposition to the use of ocean waters for waste disposal. Implicit in our opposition of *all* ocean dumping, however, has been the recognition that feasible alternatives are not always available." 1972 Senate Report, U.S.Code Cong. & Admin.News 1972, at 4259 (emphasis in original).

7. Section 1412(a) proscribes all dumping of high-level radioactive wastes and chemical or biological warfare agents. EPA had opposed such an absolute ban, *see* House Report No. 92–361, 92d Cong., 1st Sess. 41 (1971), but Congress rejected that position. As Representative Frey (a member of the Committee on Merchant Marine and Fisheries and a prominent sponsor of the legislation) explained: "The serious adverse effects which the dumping of these materials could and do have, coupled with interim and long-term alternatives to their dumping in the oceans, have led me to conclude that no rational *balancing of interests* requires the use of our oceans and coastal waters for their dumping." 117 Cong.Rec. 30,-860 (1971) (emphasis added). By contrast, section 1412(a) does not require a rational balancing of interests with respect to the dumping of other materials.

must seek to achieve the requisite balance in establishing or revising the statutory criteria. The Agency itself explained in a section-by-section analysis of the legislation prior to adoption that:

> In establishing or revising the criteria, the Administrator is required to consider the likely impact of the proposed dumping along with alternative locations and methods of disposal, including those based on land, the probable impact of using such alternatives on considerations affecting the public interest, and the probable impact of issuing or denying permits on such considerations.

1972 Senate Report, U.S.Code Cong. & Admin.News 1972, at 4256; House Report No. 92–361, 92d Cong., 1st Sess. 33 (1971) [hereinafter cited as 1972 House Report]. The manner in which EPA phrased the factors that it would be "required to consider" indicates that these factors would be meaningfully incorporated into the criteria, not merely mentioned and then ignored. The factors referred to by EPA, moreover, could not meaningfully be applied in advance to all cases. The Interior Department's analysis of the legislation similarly reflected the Administration's view that the bill required consideration of these factors (when applicable) in the actual decision on permit applications, not merely in promulgating the regulations.[8]

The final committee reports from both houses of Congress also adopted this understanding of section 1412. The Senate Commerce Committee stated:

> In order to make the determination [as to whether the proposed dumping will unreasonably degrade the marine environment], the Administrator is required to establish and apply certain criteria for reviewing and evaluating permit applications .... The criteria as established or revised must take into account, but need not be limited to, *the need for the proposed dumping*, the effect of such dump-

ing on human health and welfare, ... and the effect of dumping on marine ecosystems (including marine plant life), as well as the persistence and permanence of the effects, the effect of particular volumes and concentrations of materials, *an evaluation of appropriate alternative locations and methods* of disposal or recycling, the effect on other uses of the oceans, *and the possible effects of denying a requested permit.*

1972 Senate Report at, U.S.Code Cong. & Admin.News 1972, 4246 (emphasis added).

The House Committee on Merchant Marine and Fisheries similarly viewed the statutory factors as obligatory upon EPA: "In determining whether to approve a permit application, the Administrator would be required to consider (1) the impact of dumping on the marine environment and human welfare and (2) other possible locations and methods of disposal, including land-based alternatives...." 1972 House Report at 10. "The criteria as established or revised must take into account [the factors enumerated in section 1412(a)] ...." *Id.* at 18.

Statements of the bill's sponsors during the respective debates are precisely in accord with the language of the committee reports. Senator Hollings, floor manager of the legislation in the Senate, stated:

> [W]ritten into the bill in section 102 are stringent criteria which the administrator must meet in reviewing permit applications. Properly applied, these criteria will provide the Administrator with adequate information to minimize or eliminate any adverse impact that any given ocean dumping of materials might have. The Administrator must consider [the factors enumerated in section 1412(a)] ....

117 Cong.Rec. 43,068 (1971). In the House, Representative Lennon (Chairman of the Subcommittee on Oceanography) presented a series of questions and answers to clarify the bill:

---

**8.** The Interior Department stated: "In determining whether or not to approve a permit application, the Administrator would be required to consider (1) the impact of dumping on the marine environment and human welfare

and (2) other possible locations and methods of disposal, including land-based alternatives ..." 1972 House Report at 66; 1972 Senate Report U.S.Code Cong. & Admin.News 1972, at 4259.

Q. Is there a standard established under which permits are issued?

A. Yes. The standards for reviewing and evaluating permit applications are based upon criteria to be established by the Administrator which will take into account the need for the proposed dumping, its effect upon the area in which it is to take place, including the living resources and the marine ecosystem, as well as the permanence of those effects and the volume and concentration of the particular proposed dumping. The criteria also cover appropriate locations for the dumping and available alternative methods of disposal, including the availability of land based alternatives.

117 Cong.Rec. 31,156 (1971).[9] The remarks of other legislators were to the same effect.[10]

EPA can point to nothing in the legislative history that contradicts this universal understanding of section 1412(a). Congress gave the agency leeway in enforcing section 1412; it did not foreclose EPA from considering additional factors, nor did it specify the particular balance that EPA must strike in weighing these factors or the procedure by which applications should be decided. But no legislator suggested that EPA could ignore the statutory factors in evaluating individual permit applications. On the contrary, the Congress clearly intended that EPA adopt and apply criteria that would lead the Agency to consider all relevant statutory factors in evaluating each proposed dumping.

EPA contests this construction. It contends that the Act requires the Agency to consider the statutory factors in formulating or revising the criteria, but not in applying the criteria in specific cases. In essence, EPA claims that it may adopt criteria that ignore the statutory factors, so long as it considered those factors in adopting the criteria. Of course, EPA need not build into its criteria consideration of factors that are unnecessary in particular cases. But neither the statutory language nor the legislative history supports the view that EPA may use its authority to develop criteria in such a manner as to allow it to exclude any factor whose consideration is necessary for rational decisionmaking. Nothing in Chief Judge J. Skelly Wright's recent opinion in *National Wildlife Federation v. Costle*, 629 F.2d 118 (D.C.Cir.1980), is inconsistent with this proposition.[11]

---

**9.** On another day of the debate, Representative Lennon stated that the Administrator:

will be guided in issuing permits by criteria to be developed to serve as the standards under which permits may be issued. *The criteria will require an evaluation of all pertinent factors* before any materials can be transported for dumping. . . .

He went on to list the factors contained in Section 1412(a). 117 Cong.Rec. 30,856 (1971) (emphasis added).

**10.** *See, e.g.,* 117 Cong.Rec. 31,155 (1971) (remarks of Rep. Harrington) (Title I "requires the Administrator to *establish criteria for evaluating permit applications which would take into account* the effect on the marine environment and human welfare and an evaluation of alternative locations and methods of disposal." (emphasis added)).

**11.** The *National Wildlife Federation* decision held that the regulatory criteria promulgated for dumping dredged materials need not be identical to those promulgated for nondredged materials; the Administrator "may rationally conclude that the evaluation factors require certain criteria for one kind of waste and other criteria for another." 629 F.2d at 135. Never-

theless, the Court vacated some of the regulations related to dredged materials because EPA had failed adequately to explain why they differed from analogous regulations governing nondredged material.

EPA seizes upon some of the language in the opinion as supporting its position: *e.g.,* "the Administrator is not required by any provision in the Act to include in the criteria, in any literal sense, the evaluation factors listed in the Act. . . ." *Id.* But such broad statements must be read in the context of the particular question before that court: namely, whether the statutory factors must be applied identically to dredged and nondredged materials. EPA's position in that case, moreover, was far less extreme than it is in this suit: "[EPA] argues that the statutory language is broad enough to permit the Administrator to determine that certain of the factors may not be relevant to evaluation of a particular permit application. The Government concedes that the Ocean Dumping Act requires the Administrator to consider all of the factors listed in the statute and the Convention. But it denies that the statute requires different materials to be

## III. VALIDITY OF THE OCEAN–DUMPING REGULATIONS

The overriding question in this litigation is whether EPA's ocean-dumping regulations, 40 C.F.R. Ch. 1, Subch. H (Parts 220–229) (1979), are consistent with the governing statute. To address that question, the background of the regulations and the operation of the substantive ecological standards must first be examined.

### A. *Background of the Regulations*

EPA's construction of the 1972 Act has been ambivalent from the outset; in fact, the Agency's interpretation of the Act prior to 1978 was in many respects consistent with the City's present position. Nevertheless, the Agency early adopted a series of questionable regulatory assumptions. In particular, EPA decided to work toward the absolute prohibition of all dumping of materials that could conceivably be detrimental to the ocean environment. The Agency presumed that dumping of materials it deemed to be potentially harmful constituted a threat to the ocean environment—even if the dumping might not constitute unreasonable degradation under the Act. EPA issued only interim permits for such dumping, and those permits required the dumper to prepare and implement a plan for complete cessation of the dumping.

At the same time, EPA also used the interim permit to allow dumping that in particular cases could well have resulted in unreasonable degradation. In particular, the Agency granted interim permits to municipalities on a showing that they had attempted in good faith to obtain funding to end their reliance upon ocean disposal. This exemption from EPA's normal rules was often granted to a municipal dumper irrespective of the damage that its particular dumping might cause and without a thorough inquiry into the factors that the

Act required the Agency to consider. An examination of the regulatory history shows how both these questionable practices developed.

EPA began enforcing the Act by relying, temporarily, upon "the factors set forth in section 102(a)" until criteria based upon those factors could be formulated. 38 Fed. Reg. 8727 (1973), § 222.1. As soon as the Agency was able to formulate criteria, however, it signalled its intention to refuse to issue regular permits for the dumping of any material potentially detrimental to the ocean environment. In its "Interim Criteria," issued on May 9, 1973, EPA announced that it would not issue permits for materials that Congress had prohibited from being dumped, and that (subject to exceptions) it would not approve the dumping of more than "trace" concentrations of a number of substances, including mercury and cadmium. 38 Fed.Reg. 12,872–73 (1973), § 227.-22. Special permits could be issued to dump these "prohibited" materials, but only in quantities that were demonstrably harmless to the marine environment. *Id.* § 227.-22(e). The dumping of other potentially harmful materials was to be "strictly regulated," *id.* § 227.30, and these materials, too, could only be dumped in harmless quantities, *id.* § 227.31.

The interim criteria were thus based solely upon the nature of the material proposed to be dumped; the initial set of regulations ignored the factors upon which the Act required the criteria to be based. Consequently, the regulations enabled EPA to deny special permits in situations in which, on balance, the proposed dumping would not unreasonably degrade the ocean environment.

Yet EPA established exceptions to these provisions that made less significant its failure to balance the statutory factors.[12] The

---

treated as if they were the same." *Id.* at 132. The court agreed that "the Administrator has authority to conclude that certain statutory evaluation factors are inapplicable to a class or type of material." *Id.* As the holding reflects, however, EPA's conclusion that a

factor is inapplicable to a certain class of materials must be reasonable.

12. The regulations provided that prohibited materials could be dumped in amounts exceeding trace or limiting permissible concentrations pursuant to "interim special permits." Such permits could be issued only after "evaluation

effect of these exceptions was to enable some applicants who in effect passed the statutory test for reasonable dumping to obtain permission to dump even prohibited materials—but only on an interim basis, and only in exchange for a commitment to reduce or eliminate such dumping. The exceptions enabled applicants, such as New York City, to continue to dump legally with no absolute deadline and thereby mitigated the need for such applicants to challenge EPA's regulatory scheme.

On October 2, 1973, EPA issued "Final Regulations and Criteria on Ocean Dumping." Once again, the Agency manifested a determination to terminate all dumping of any materials that could conceivably be harmful to the ocean environment, irrespective of whether a particular applicant could demonstrate that its dumping would not unreasonably degrade the ocean environment if judged by the statutory factors. "General permits," with no expiration date, were available for dumping that was demonstrably harmless. 38 Fed.Reg. 28,613 (1973), § 220.3(a). Any dumping not covered by a general permit had to be authorized by "special permit", which would have a fixed expiration date and a duration of up to three years. But special permits could not be "granted for any material which does not meet the criteria of §§ 227.22 and 227.31," provisions that carried over from the interim criteria EPA's decision to prohibit or strictly regulate a long list of sub-

stances deemed potentially hazardous. Unless the dumping of these listed substances posed no danger to the environment, they could be disposed of in the ocean only pursuant to an "interim permit." As in the proposed regulations, the conditions under which an interim permit could be obtained involved a case-by-case balancing of the "factors" spelled out in the Act. The applicant for an interim permit would have to engage in an environmental assessment of the proposed dumping, including a thorough review of the "actual need" for the dumping and the "possible alternatives." The Agency's decision would essentially be based upon consideration of the factors specified by Congress as the proper bases for EPA's criteria.[13]

Although the regulations appeared to require applicants, even for interim permits, to demonstrate that their proposed dumping would not unreasonably degrade the ocean environment, EPA developed exceptions based upon less stringent standards. Municipalities that sought to dump sludge containing excessive amounts of proscribed materials were granted interim permits on a showing that they had attempted in good faith to implement a plan to end the dumping entirely—for example, by attempting to raise the necessary funds for an alternative disposal system. This practice resulted in EPA's allowing some dumping that violated the Act, for the Act provided that an applicant's good faith efforts could at most be

of potential environmental impact [and] a thorough review of the actual need for the dumping and possible alternatives"; the decision would be based upon a consideration of factors similar to those specified in the Act. See 38 Fed. Reg. 12,873 -74 (1973), § 227.42. No interim special permit could be issued unless an applicant (i) could demonstrate the need to dump as compared to other options, (2) could establish that the need for dumping "outweighs" the potential harm from dumping, and (3) could "provide a satisfactory implementation plan covering future dumping activities and full adhere to the plan." Id. § 227.43. As to those materials to be "strictly regulated," the regulations provided: "Until such time as specific quantitative criteria are available for guidance, EPA approval [of permits to dump such materials] will be based on a case-by-case evaluation of each application." Id. § 227.30.

13. See generally 38 Fed.Reg. 28,614 (1973). The revised regulations described more specifically the additional requirement that applicants for interim permits develop and actively implement "a plan to either eliminate the discharge entirely from the ocean or to bring it within the limitations" established for special permits, i.e., to eliminate any substantial chance of harm. Interim permits could not be renewed, but EPA agreed to issue new interim permits "upon satisfactory completion of each phase of development and implementation of the plan." Id. § 220.3(d)(1), (2). Interim permits were made unavailable to any new or expanded facility. Id. § 220.3(d)(3). In effect, EPA concluded that—solely by virtue of its newness—the dumping of any newly generated wastes was presumptively unreasonable (unless such wastes could qualify for a special permit).

one factor among many—not the sole factor—that the Agency must balance in establishing the criteria. Furthermore, EPA set no absolute deadline on dumping by such municipalities pursuant to interim permits; unreasonably degrading activity could therefore continue indefinitely. Many municipalities apparently received interim permits on the basis of this exception.[14]

These regulations remained in effect until 1976. On June 18, 1976, EPA issued a "Proposed Revision of Regulations and Criteria" for ocean dumping. In it, the Agency proposed some major changes that remain at the heart of the regulatory structure. EPA's fundamental purpose remained the same: "to eliminate ocean dumping of unacceptable materials as rapidly as possible," 41 Fed.Reg. 26,644 (1976), not merely to eliminate dumping found to degrade the ocean unreasonably. The Agency stated that interim permits "have been an effective tool into [sic] prodding ocean dumpers into more acceptable alternatives." Id. at 26,646. It proposed to stop issuing such permits by April 23, 1978. Yet the proposed regulations excepted municipal sludge dumping from that deadline in cases in which "the applicant has exercised his best efforts to comply with all requirements of a special permit ...." Id. at 26,649, § 220.3(d)(1). To be eligible for a special permit, an applicant was still required to demonstrate that the materials that it proposed to discharge posed no substantial risk of harming the marine environment. But the process for making this demonstration was changed, and these changes have been carried forward to the regulations presently in force.

The newly proposed criteria for evaluating permit applications contain seven subparts, designated A through G. Subpart A states the general rule to govern all applications and turns strictly upon the material proposed to be dumped. The pivotal portion is Subpart B, which contains the "environmental impact criteria." To obtain a special permit, the applicant must prove that the material to be dumped satisfies the impact criteria; if it does, then the applicant must also demonstrate that the dumping meets the requirements of Subpart C (need to dump and lack of alternatives), Subpart D (no unacceptable adverse effects on esthetic, recreational, or economic values), and Subpart E (no unacceptable adverse effects on other values). Id. at 26,-656, § 227.2(a). Sludge that satisfies the impact criteria of Subpart B, but fails to satisfy some other criterion, may be dumped pursuant to an interim permit, if the applicant makes a strong showing of need. Id. § 227.2(b).

Of particular significance to this litigation are the rules governing sludge that does not satisfy the impact criteria of Subpart B. Id. at 26,656–57, § 227.3. EPA will deny a special-permit application for the dumping of such sludge irrespective of the applicant's capacity to satisfy the criteria set forth in Subparts C through E. Such sludge may be dumped only pursuant to an interim permit. As in the prior regulations, the interim permit is available only upon a strong showing that the dumping satisfies the criteria governing need, alternatives, and effect on other values. No matter how strong an applicant's case for dumping a given substance, if the material violates—even marginally—the impact criteria, then it can be dumped only pursuant to a temporary and discretionary license—a license that will not be issued unless the applicant adopts a plan either to stop dumping the material involved or to bring the dumping into compliance with the impact criteria.

EPA's approach in its final regulations to ascertaining environmental impact became more sophisticated than its prior approach, but it remained conservative. EPA's origi-

14. Precise quantification of the number of municipalities that received interim permits solely by virtue of their good-faith efforts to obtain funding is not possible, for EPA has not compiled the relevant decisions for the Court. Nevertheless, the legislative history of the 1977 amendment, and EPA's opposition to that amendment, make clear that this practice was common. See Part IV post.

nal approach under the Act was to base a finding of unacceptable environmental impact upon the presence of certain amounts of specific constituents; among the proscribed constituents were several heavy metals, including mercury and cadmium. By 1977, the Agency had concluded that the "criteria should be based, wherever possible, on impacts of dumped materials on marine ecosystems, and that these impacts could be measured best by bioassays rather than by relying on determination of total amounts of specific constituents present in a waste." 42 Fed.Reg. 2466 (1977). The Agency therefore revised its criteria to define trace contaminants as "amounts and forms" of a constituent that "will cause no significant undesirable effects through either toxicity or bioaccummulation." *Id.* As the proper test of whether a particular waste would cause undesirable effects, the Agency decided to rely upon "the direct determination of the impact of these constituents present in a waste on the marine ecosystem, as measured by bioassay techniques." *Id.* Bioassay techniques, EPA explained, would enable the Agency to ascertain the impact of materials on the marine environment more reliably than its practice of inferring damage from the mere presence of certain quantities of "strictly regulated" materials.[15] *Id.* at 2466–67.

In the final regulations of January 1977, EPA implemented this new approach in principle. Several materials, including mercury and cadmium, were deemed "constituents prohibited as other than trace contaminants." *Id.* at 2477, § 227.6.[16] Whether an unacceptable effect had been caused by such a constituent "shall be determined by application of results of bioassays of liquid, suspended particulate, and solid phases of wastes according to procedures acceptable to EPA . . . ." *Id.* § 227.6(c). The Agency established stringent conditions of environmental acceptability for the liquid, suspended-particulate, and solid phases of substances proposed to be dumped. The high degree of protection afforded by these criteria is reflected by the requirement that, when no criteria are available for a given constituent, the limiting permissible concentration ("LPC") in the liquid phase is that concentration which, after initial mixing, "will not exceed a toxicity threshold defined as 0.01[1%] of a concentration shown to be acutely toxic to appropriate sensitive marine organisms in a bioassay." *Id.* at 2481, § 227.27(a)(1), (2).[17] The Final Regulations establish similarly conservative standards for the suspended-particulate and solid phases of wastes.[18] Because bioassay tests were initially unavailable for any but

15. EPA explained its action as follows:
    Sections of Part 227 have been revised to reflect the recommendations of the workshop; thus all criteria are based on ecosystem impact rather than on assumptions regarding allowable deviations from normal ambient values. These revisions are consistent with the concept of "unreasonable degradation" in these regulations and are directed toward achieving the goal of preventing significant impact upon the biota. The use of bioassay results for regulatory purposes will provide EPA with direct measurements of the impact of dumping materials, so that it will no longer be necessary to infer damage indirectly through measurements related to normal ambient values.
    42 Fed.Reg. 2466 (1977).

16. These constituents were to be considered "present as trace contaminants only when they are present in materials otherwise acceptable for ocean dumping in such forms and amounts in liquid, suspended particulate, and solid phases that the dumping of the materials will not cause significant undesirable effects, including

the possibility of danger associated with their bioaccumulation in marine organisms." *Id.* § 227.6(b).

17. Initial mixing is EPA's conservative allowance for dispersion or diffusion of material in any phase—that which occurs within four hours after dumping. *Id.* § 227.29(a).

18. The regulated contaminants are deemed present in trace quantities only when properly conducted bioassay results "do not indicate occurrence of significant mortality or significant adverse sublethal effects including bioaccumulation. . . ." *Id.* at 2477, § 227.6(c)(2). Moreover, the absence even of such "sublethal" effects must be established by bioassays of sufficient duration "to provide reasonable assurance, based on considerations of statistical significance of effects at the 95 percent confidence level, that, when the materials are dumped, no significant undesirable effects will occur. . . ." *Id.* § 227.6(c)(3).

the liquid phase, *id.* at 2467, EPA continued to rely upon numerical limitations on the discharge of strictly regulated constituents in the suspended-particulate or solid phases. Subsequently, however, EPA developed bioassay techniques for all three phases, and it no longer uses the interim numerical limitations. *See* 42 Fed.Reg. 44,835 (1977); 43 Fed.Reg. 28,249 (1978).

The revised regulations proposed in June 1976 established an April 23, 1978 termination date for industrial dumping. EPA proposed not to impose such a deadline, however, "for the dumping of wastes from sewage treatment works of municipalities presently under interim permits when the applicant has made a showing of good faith effort to comply with requirements of a special permit...." 41 Fed.Reg. 26,644 (1976). Such dumpers did not even have to propose a schedule for termination of dumping by a particular date. The exception for these dumpers was based entirely on their public status, not on the overall impact of their dumping on the marine environment. EPA subsequently acknowledged that, with respect to municipal dumpers, it had allowed financial considerations to overcome environmental considerations.

> The proposed regulations authorized issuance of interim permits for sewage treatment works on a showing that the dumper had exercised best efforts to comply with the requirements of a special permit. They did not require the dumper to have an implementation schedule adequate to permit compliance or phasing out by a specific date. No deadline was imposed on municipal dumpers because of their often complicated dependence on public agency funding sources.

42 Fed.Reg. 2463 (1977).

Some of the public comments on the proposed regulations opposed such lenient treatment of municipal dumpers. In particular, four members of the House Subcommittee on Fisheries and Wildlife Conservation and the Environment (Representatives Leggett, Breaux, Forsythe, and Mosher) criticized EPA for continuing "to allow a substantial volume of dangerous, toxic materials to be dumped under 'interim permit' arrangements"; the Congressmen contended "that such 'interim permits' should be summarily phased out without continued exceptions." *Id.* at 2464 (quoting letter).

The Agency defended its use of interim permits. In essence, EPA reasoned that the impact criteria of Subpart B were so stringent that interim permits were necessary to provide flexibility. To establish the impact criteria, EPA had estimated "those levels of pollutants which may be expected to cause environmental harm" and then applied a safety factor to those levels. Absent interim permits, EPA would be forced to surrender the "conservative limits on special permits" and to adopt "lenient definitions of trace contaminants or special permit criteria." *Id.* at 2464. EPA contended that, given the stringent impact criteria, issuance of interim permits would not result in unreasonable degradation.

> Interim permits are not illegal under the Act, since they do not authorize dumping which would "unreasonably" degrade or endanger the marine environment. The Act lists need for ocean dumping as one factor to be considered in issuing permits. The "need factor" has outweighed other considerations due to the lack of alternative methods of disposal and technology necessary to meet environmental criteria.... [I]n no event does this section authorize dumping of materials that are absolutely barred by the Act or the Convention, or authorize dumping above trace contaminant levels of materials proscribed....

*Id.* at 2462–63.

Despite the Agency's defense of interim permits, the final regulations published in early 1977 required all dumping that violated the impact criteria to end by December 31, 1981. EPA imposed the deadline on municipal dumpers in response to criticism of the proposed regulations. "Technology exists to permit municipalities to meet this deadline; and all interim permits currently held by municipalities provide for compliance or phasing out by the end of 1981." *Id.* at 2463. The Agency's statements made

clear that the sole factor that it had weighed in imposing the absolute deadline was technological feasibility, and that it interpreted the Act to require cessation of all potentially harmful dumping irrespective of its reasonableness under the circumstances:

The deadlines contained in this section are based on current projections of technological feasibility, and it is reasonable to expect dumpers to meet them. The primary purpose of the Act is to protect the marine environment, and dumping in violation of environmental criteria [*i.e.*, Subchapter B] cannot be allowed to continue indefinitely. The EPA therefore will not retain discretion to issue interim permits to applicants who do not meet the requirements of this section.

*Id.*

The background of the ocean-dumping regulations thus demonstrates two contradictory strands in EPA's enforcement of the Act. On the one hand, the Agency was excessively lenient in tolerating municipal sludge dumping: the key factor in obtaining an interim permit was the dumper's good faith in attempting to obtain funding for an alternative sludge-disposal program. EPA was responsive to municipalities' fiscal pleas without fully ascertaining the need for, or impact of, their dumping. On the other hand, EPA adopted very stringent impact criteria and made them the dispositive factor in determining whether particular dumping was unreasonable—irrespective of the need for ocean dumping or the consequences of alternative disposal. Only the availability of interim permits mitigated this rigidity in the impact criteria. In effect, EPA was both too lenient and too harsh—and in neither respect did it consider the panoply of factors specified by the Act.

### B. *Defects of the Regulations*

EPA contends that its imposition of a 1981 deadline on municipal sludge dumping is reasonable and consistent with the 1972 Act. EPA's position is in substance as follows. The Act authorized the Agency to adopt criteria for ruling on permits, but did not require EPA to consider all the statutory factors in passing upon every permit application. The policy of focusing initially upon the environmental impact of proposed dumping is reasonable and consistent with the Act's protective purpose, and the decision to prohibit all dumping of potentially hazardous substances in sewage sludge after 1981 is within EPA's discretion. The statutory deadline as applied to New York City is reasonable because EPA has found that the first phase of the plan for land-based disposal is technologically feasible, and because the City has not established that composting pursuant to the first phase would create unacceptable environmental risks.

■ Several of EPA's contentions as to its authority are correct. The Act delegated broad discretion to the Agency, and its determinations—of policy, of law, and of fact—are all entitled to deference. Thus, EPA may lawfully adopt criteria, instead of relying directly upon the factors described in the Act, and the criteria may permit' EPA reasonably to treat some factors as inapplicable in specified situations. *See National Wildlife Federation v. Costle, supra*, 629 F.2d at 131–32. Nothing in the Act requires that EPA engage in a comprehensive balancing of the factors in deciding every permit application. The notion that some applications may be denied solely because of the projected environmental impact of substances to be dumped might be justified in light of the Act's purposes. Even the decision to pressure municipalities to end dumping of materials that are only potentially hazardous might be appropriate.

■ These principles fail, however, to authorize EPA's regulatory approach in its entirety. Nor do they provide an adequate basis for the findings and conclusions underlying EPA's refusal to consider the City's application for an extension. The deference accorded an administrative agency is not limitless: the agency may not act arbitrarily or capriciously in light of the statutory purpose. *See, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d

136 (1971); *Starr v. FAA*, 589 F.2d 307, 311 (7th Cir. 1978); *Ethyl Corp. v. EPA*, 541 F.2d 1, 34–36 (D.C.Cir.) (en banc), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). Moreover, the agency is entitled to less deference when it has changed its position without adequate explanation. *See, e.g., Local 777, Democratic Union Organizing Committee v. NLRB*, 603 F.2d 862, 871–72 (D.C.Cir.1978); *Mukadam v. United States Department of Labor*, 458 F.Supp. 164, 168 (S.D.N.Y.1978).

Even if accurate, the proposition that section 1412 of the Act merely obligates EPA to consider the statutory factors in formulating criteria does not free the Agency to disregard any factor entirely. EPA could in principle adopt criteria that require denial of a permit solely because of an anticipated adverse environmental impact. The Agency's position—and the apparent rationale behind Subpart B—is that an absolute prohibition is permissible under the Act, at least with respect to substances shown to be harmful in the amounts proposed for dumping. Yet Congress expressly addressed whether certain substances are so dangerous to the ocean environment that their dumping should be absolutely prohibited: the Act did absolutely proscribe dumping of several particular substances. All other materials, by contrast—including mercury and heavy metals—were left to be "strictly regulated." When Congress has intended to preclude consideration of cost or conflicting policies, thus elevating environmental impact to dispositive status, it has done so explicitly. *See, e.g., EPA v. National Crushed Stone Association*, 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980); *TVA v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). Here, with the exception of a few specific materials, Congress has done the opposite. Both the language of the Act and its legislative history establish that EPA must balance the relevant statutory factors in evaluating permit applications.

Even assuming that EPA could lawfully prohibit the dumping of certain materials without balancing other considerations, it could do so only if the substances were so potentially damaging, in the amounts actually disposed of and at the particular dumpsite, that they must be prohibited irrespective of the cost, difficulty, or dangerousness of alternative remedies. To comply with the Act, EPA must have undertaken an informed balancing process at least in its formulation of the criteria, if the Agency is to be allowed to dispense with such a balancing process in the case-by-case application of the criteria.

■ EPA's final regulations are deficient in several respects. EPA has acted unreasonably (1) in establishing Subpart B's conclusive presumption of unacceptable harm; (2) in assuming that technologically practicable alternatives to the ocean dumping of sludge exist in all cases; and (3) in forcing the City to proceed with the interim steps of a land-based alternative without evaluating and finding acceptable the actual and potential environmental effects of land disposal.

1. *The Conclusive Presumption of Unreasonable Degradation*

The Act undoubtedly contemplates that, as the potential dangerousness of particular materials increases, the burden of justifying dumping of those materials will increase correspondingly. The underlying approach of Subpart B is to determine in advance that the potential adverse effects of some proposed dumpings are so substantial as to be beyond justification. The Administrator underscored the extreme nature of EPA's approach in his evaluation of Philadelphia's permit application. He explained that the decision to force Philadelphia to terminate ocean dumping by 1981

is based not so much on significant evidence of actual harm at the site but on the general concern of the scientific community over continued addition of heavy metals and other pollutants to the ocean.... It is obvious that even assuming no harm has occurred at this point in time, the City has not shown that its continued dumping will not contribute to a general deterioration of the ocean or that such deterioration will not eventually cause adverse effects.

*In the Matter of the Interim Ocean Disposal Permit No. PA–010 Granted to the City of Philadelphia* 2, 4 (EPA Sep. 25, 1975) [hereinafter cited as *Philadelphia Decision*].

However defensible this approach may be in theory, its application by EPA in its final regulations is unreasonably conservative. Even assuming that the environmental impact criteria are reasonable in the abstract,[19] they ignore the characteristics of the particular dumpsite for which a permit is sought. As the Agency acknowledges, "the conclusive presumption of unreasonable degradation associated with 40 C.F.R. 227.6–8 attaches based on testing of the materials proposed for dumping, with an allowance for initial mixing, rather than an assessment of actual environmental impacts at a site." Defendants' Post-Opinion Memorandum at 10 n.*.[20] The Agency's emphasis, as expressly stated in the Philadelphia Decision, is "not so much on significant evidence of actual harm at the site but on the general concern . . . over continued addition of heavy metals and other pollutants to the ocean." *Philadelphia Decision* at 2. EPA's interpretation contradicts the Act's requirement that the criteria "take into account . . . [the proposed dumping's] *effect upon the area in which it is to take place.*" 117 Cong.Rec. 31,156 (1971) (statement of Rep. Lennon, Chairman of the Subcommittee on Oceanography) (emphasis added). In fact, the EPA Hearing Officer who evaluated the City's permit application recognized that the "regulatory language must be read in conjunction with the statutory provision it was designed to imple-

ment. . . . Therefore, unless there is some unreasonable degradation or endangerment from the continued use of the 12-mile site for the dumping of sewage sludge, there is no statutory compulsion to stop it even after December 31, 1981." Healy Affidavit, Ex. E, at 2.

This exclusion of the characteristics of the actual dumpsite might be permissible in some circumstances. For example, if the particular dumping were unnecessary, or if safe alternative methods of disposal were readily available, then it might be reasonable for EPA to proscribe dumping of materials that are judged harmful in the abstract. But EPA · uses the failure of the particular sludge to satisfy these abstract impact criteria to preclude consideration of all other factors, including the need for dumping and the availability of alternative disposal methods. As a result, EPA bans dumping of particular sludge that violates the general standards, even if that dumping would not lead to significant additional deterioration at the dumpsite and even if immediate cessation of the dumping would not result in significant environmental improvement of that area of the ocean in the future. Under these circumstances, the regulations' conclusive presumption of unacceptability—to the automatic exclusion of all other factors—violates the Act's requirement that the Agency prevent only *unreasonable* degradation.

The arbitrariness of EPA's conclusive presumption is illustrated by the circumstances of this case. The City contends that

19. The original opinion (at pages 34–37) analyzed various defects in the environmental impact criteria themselves. The parties continue to disagree, for example, over whether the finding that the City's sludge violates the criteria is based upon reliable bioassay tests or upon arbitrary interim numerical limitations. The Agency has requested "the Court to clarify that the Court is not holding that the bioassay procedures themselves are an unacceptable method of gauging environmental harm and that EPA's regulations are invalidated only to the extent that they establish a conclusive presumption of unreasonable degradation." Defendants' Post-Opinion Memorandum at 9, 13. EPA is correct. Accordingly, that discussion has been deleted from this revised opinion.

20. The environmental characteristics of the dumpsite are taken into account only in one respect: the extent of dispersion and diffusion available at the site, for purposes of the release-zone and initial-mixing concepts. *See* 40 C.F.R. §§ 227.28, .29. The Agency concedes that "Subpart B does create a conclusive presumption of unreasonable degradation based on failing laboratory tests with an allowance for initial mixing, *without an explicit assessment of actual or likely environmental impacts at a site.*" Defendants' Post-Opinion Memorandum, App. at 10–11 (emphasis added).

the actual condition of the New York Bight is such that continued dumping (pending development of safe alternatives) would not result in unreasonable degradation. For example, the City points to evidence that the presence of heavy metals in the Bight is so great that continued sludge dumping would generate little incremental deterioration; conversely, cessation of sludge dumping, the City contends, would result in no discernible improvement in the area of the ocean around the dumpsite. The City's sludge contributes only a small portion of the contaminants that now reach, and that will for many years continue to reach, the Bight. Sources other than sewage sludge, especially wastes and dredged spoils, have accounted for more than 94% of the heavy metals contaminating the Bight. Although these characteristics of the Bight do not preclude EPA from seeking to prevent the dumping of additional heavy metals, they do constitute a factor that the Act requires EPA to consider. EPA cannot determine whether dumping will be unreasonable without at least some consideration of the sludge's actual effects at the dumpsite.

EPA's past actions with respect to location of New York City's dumpsite underscore the unreasonableness of its current refusal to take the Bight's characteristics into account. After investigating fears that sludge dumping in the Bight was responsible for contamination of local beaches, EPA concluded in 1978 that "continued use of the existing site is not a threat to public health or to water quality along the Long Island or New Jersey beaches." EPA found that "the quality of the existing site and its surrounding area could not be expected to improve significantly, even if sludge dumping were terminated, because the bottom is severely contaminated and pollutants from other sources will continue to flow into the Bight apex." Healy Affidavit, Exhibit D, at 5 (quoting EPA's Environmental Impact Statement on the Ocean Dumping of Sewage Sludge in the New York Bight). These conclusions are consistent with the findings of the National Oceanic and Atmospheric Administration ("NOAA"): "the impacts of dumping of the wastes appear to be localized and temporary in the Bight and ... [it appears] that water quality conditions in the vicinity of the dumping area return to normal within hours of dumping events." Id., Exhibit D, at 4 (quoting NOAA, Report to Congress on Ocean Dumping Research, January through December, 1977 at 13). At that time, NOAA opposed any change in the dumping site:

The sewage sludge dumpsite should not be relocated. The responsible public health agencies still have no evidence that the existing dumpsite poses a threat to the health and well-being of people using the beaches. There is also no evidence of massive migration of dumped sewage sludge toward the beaches of Long Island or New Jersey. Additionally, moving the dumpsite would not result in any significant overall improvement of the water quality of the Bight apex because the effects of the dumped sewage sludge are masked by the larger mass-emission rates of pollutants from shoreline outfalls, rivers, and embayments.

42 Fed.Reg. 23,164 (1977) (quoting NOAA report). EPA accepted NOAA's recommendation and refused to require the City to dump sludge at a particular site that was much farther off-shore, had much deeper waters, and had "neither significant commercial benthic biological resources (shellfish) nor known potential mineral resources (oil and gas, sand and gravel)." 43 Fed. Reg. 56,061–62 (1978). EPA ruled that the alternative site could be used "only upon a finding by EPA that the existing site cannot safely accommodate any more sewage sludge without endangering public health or degrading coastal water quality." 44 Fed.Reg. 29,052–53 (1979).

EPA's decision to retain the New York Bight as the area's sludge dumpsite is significant in two respects. First, although the decision was premised upon the expectation that sludge dumping would cease by the end of 1981, it nevertheless suggested that the dumping had relatively benign short-term consequences and that termination of the dumping would not result in

significant immediate improvement. These findings are at odds with those that implicitly underlie EPA's use of the Subpart B criteria to presume significant adverse effects. Although the Agency might be able—in the face of contrary evidence—to justify treating the results of its presumptions as conclusive, it has offered no such justification. Second, despite the availability of an alternative site well-suited for dumping, EPA decided to allow dumping to continue at the same site in the Bight, "until sludge dumping could be replaced by environmentally, technically, and economically viable land-based disposal methods." 43 Fed.Reg. 56,061 (1978). If EPA were properly to conclude that the City's dumping in the Bight caused unreasonable degradation, the Agency would need to explain why the alternative site could not safely be used. Yet the Agency has not suggested why dumping of the alternative site would result in unreasonable degradation. Instead, EPA has chosen to evaluate the

sludge's environmental impact in a manner that makes largely irrelevant the characteristics of the proposed disposal site.

EPA contests many of the City's assertions as to the actual effects of sludge dumping on the New York Bight; for example, the Agency insists that continued dumping is causing further deterioration, while other sources of pollution in the area are diminishing.[21] The validity of the City's claims as to the dumping's actual effects on the Bight is for EPA to consider in the first instance, and this opinion does not endeavor to resolve those factual disputes. But it is precisely EPA's avowed refusal to consider these claims that renders its treatment of the City's permit application arbitrary and capricious. Even if EPA's interpretation of the Act as allowing environmental effects to be dispositive were correct, the Agency would still be required to consider actual and likely dumpsite characteristics in gauging those environmental effects. Accord-

21. With respect to the adverse effects of sewage sludge on the Bight, EPA has submitted the assessment of Dr. R. Lawrence Swanson, Director of NOAA's Office of Marine Pollution Assessment. *See* Declaration of Peter W. Anderson (Chief, Marine and Wetlands Protection Branch, EPA Region II), App. Swanson presented his views at an October 1979 EPA hearing on the City's application for permit renewal. He noted that the sludge contains several types of potentially harmful material, including organic matter, petroleum hydrocarbons, halogenated hydrocarbons (particularly PCB's), toxic metals, and pathogens. Swanson described the effects of those substances as including the following: alteration of benthic habitats; possible reduction of fish stocks; reduced dissolved-oxygen values; development in benthic bacteria of resistance to heavy metals and antibiotics; bacterial contamination, resulting in a ban on shellfishing within the area and the isolation of one particularly dangerous amoeba; increased incidence of fish and shellfish diseases; and sublethal effects on organisms.

Swanson's catalogue is disturbing. One instinctively recoils from the mention of "fecal coliform," "pathogens," "viral particles," "fungi," "fin rot," "shell disease," and "bioaccumulation" of toxic substances. The City's sludge no doubt contains unpleasant and dangerous substances. Nevertheless, EPA must not be permitted to distort Swanson's careful statements. First, Swanson's catalogue includes many potential—not actual—dangers, some of which are not definitely linked to municipal

sludge. Furthermore, the effects that Swanson discussed are caused by particular substances found in sludge; those substances are also found in other materials dumped or drained into the Bight. Swanson appeared to accept a recent estimate "that sewage sludge dumping presently accounts for 5 to 15 percent of the total pollution load in the Bight. . . ." Swanson stated that continued dumping of sludge will contribute additional pollutants and thereby "almost certainly retard any future recovery," but he recognized that, without significant reduction in the disposal of other waste and dredged materials, "any recovery will almost certainly be masked by the effects of those other discharges." Even if significant reductions were made in major contaminant inputs, no rapid recovery of the Bight Apex would occur. *Id.* at 4, 17.

Although Swanson recommended "that the 1981 deadline be adhered to," he based that conclusion upon the desirability—not on any imminent necessity—of an end to dumping. His only definitive conclusion was that "the ocean dumping of municipal sewage sludge is not viewed as an environmentally viable disposal alternative over the long run, meaning over twenty, thirty, or fifty years." *Id.* at 22. Swanson anticipated that some municipalities might fail to adopt land-based alternatives by 1981; in that event, he recommended that "the sewage sludge dumping activity should be moved to Deepwater Dumpsite 106 as an interim measure."

ingly, Subpart B's conclusive presumption of unreasonable degradation is arbitrary and capricious, and it may not lawfully form the basis for an order that the City terminate its sludge dumping at the end of 1981.

2. *Evaluation of the Need to Dump Sludge*

The 1972 Act lists "need for the proposed dumping" as the very first factor upon which EPA's criteria must be based. 33 U.S.C. § 1412(a)(A). In addition, in formulating its criteria, EPA must consider "[a]ppropriate locations and methods of disposal or recycling, including land-based alternatives...." *Id.* § 1412(a)(G).

EPA's interpretation of the Act, prior to 1977, emphasized the Agency's obligation to consider all the statutory factors in evaluating permit applications. In explaining its proposed regulations in 1976, EPA stated:

> Subpart A of the revised criteria states the terms of reference which the Regional Administrator or Administrator will use for making a final determination on a permit application. Each of the Subparts B, C, D, and E [of Part 227] addresses a separate consideration which is required by the statute in section 102. No subpart in and of itself is dispositive of the issue, which the Agency believes is consistent with the broad balancing required by the statute.

41 Fed.Reg. 26,645 (1976). In particular, the Agency promised to consider precisely the type of evidence that the City seeks to present:

> One of the major criticisms of the existing regulations has been the alleged inadequate attention to the demonstration of the need for dumping.... The Agency anticipates that the Regional Administrators will place greater reliance on demonstrati[on] by the applicant that alternatives to ocean disposal are infeasible or are less environmentally acceptable.

*Id.* at 26,646.

EPA offered similar assurances in issuing its final regulations. In contrast to its current position—that it must consider the need for dumping only in promulgating the regulations, not in evaluating applications— EPA then acknowledged: "The Act lists need for ocean dumping as one factor to be considered in issuing permits." 42 Fed.Reg. 2462 (1977). The statement concerning available alternatives reflected a degree of reasonableness now entirely absent from the Agency's position:

> The Agency also must consider its credibility as the regulating agency. If it demands that a small community or an industry cease dumping within a period of time, it should be confident that there are feasible alternatives which may be implemented within the time period. Increasingly, this is true; and this is the reason all interim permit holders have been given firm phase-out dates. It would be improper to adopt a cessation date which has little factual foundation. Increasingly, EPA has become aware that the alternatives to ocean dumping require careful evaluation; they may not always be better.

*Id.* at 2464.

Similarly, EPA recognized that one of the components of the need factor was the cost of replacing ocean disposal. In response to public comment on the 1976 regulations, the Agency stated:

> [T]he regulation requires the balancing of the impacts of all forms of alternatives available, including the economic impact. The purpose of this is to make sure that the most cost-effective alternative is used whether it is ocean disposal or another form of disposal, thus, acquiring the highest degree of environmental protection consistent with reasonable economic cost.... The intent of the Ocean Dumping Act is to maintain a balanced consideration of the environmental impact and the relative costs of all alternatives, including ocean dumping. It is not environmentally responsible to single out or emphasize only one factor as a basis for determination.

Final Environmental Impact Statement: Proposed Revisions to Ocean Dumping Criteria, at H–399–400 (1977) [hereinafter cit-

ed as EIS]. EPA reiterated this willingness to consider the relative costs of ocean dumping and its alternatives in its response to the Council on Wage and Price Stability's suggestion that the costs of ocean dumping should be balanced against those of land disposal. EPA remarked: "The evaluation of the costs and relative impacts of alternatives to ocean dumping must be done on a case-by-case basis for each waste. The criteria require such an evaluation in each case...." *Id.* at H–582–83.

EPA does not concede that its evaluation of New York City's application violates its earlier interpretation. Rather, the Agency contends that Subpart B of its criteria may be used to preclude dumping after 1981 because the technology for ending sludge dumping is already available. EPA has failed, however, to justify its conclusive presumption that the technology exists in *all* instances to end the ocean dumping of sewage sludge, or that the cost of available technology is justified by the danger of continued dumping.

In cases in which a municipality has adequate and appropriate land available, the necessary technology to stop dumping sludge does exist. Dewatering is a commonly used and readily available measure that can reduce the volume of sludge to be disposed. For some permit applicants, however, the disposal problem cannot be solved through conventional dewatering and land disposal. New York City has huge amounts of sludge that must be disposed of, yet has no available dumpsites on land for non-composted sludge. Composting, though technologically feasible, is only an interim measure. If a composting plan were implemented, the City would run out of public land in the City on which to spread the composted sludge within about seven years. No workable plan for a long-term solution has yet been developed; and it is the City—not EPA—that bears the burden of developing such a plan. Theoretically, any of the plans now under consideration would be feasible if, irrespective of technological or other difficulties, the City and the federal government were prepared to spend unlimited amounts to implement them. But the prac-

tical feasibility of long-term disposal alternatives is far less certain. Several jurisdictions are only now receiving consultants' reports on the available options.

Under these circumstances, EPA cannot reasonably treat the technology issue as settled. Permit applicants with disposal problems as complex as those of the City are entitled to have EPA consider and weigh these practical and technological obstacles; and EPA must base its determination of technological feasibility upon evidence, not upon hopeful but unsupported assumptions.

Neither does the Act permit EPA completely to disregard the financial implications of cessation of sludge dumping. Between 1973 and 1978, EPA gave far too much weight to this factor, accepting the word of municipalities that they had attempted to obtain financing in good faith and granting them interim permits without regard to the environmental consequences. The Agency is certainly entitled to be skeptical of claims by localities that funds cannot be raised; once the responsible public agency has been afforded an opportunity to raise the funds necessary to eliminate dumping that is unreasonably degrading, EPA would no doubt be free to deny a permit. But the cost of alternatives cannot be ignored in determining whether dumping will in fact unreasonably degrade the ocean environment. Absent proof of intolerable damage, cost is necessarily a relevant element in determining whether the degradation anticipated from a proposed dumping will be unreasonable.

In applying its deadline to New York City, EPA has done no more than estimate the short-term costs of the proposed alternative. It has presented no reliable evidence of what the long-range costs will be, and it has made no effort to explain why even the short-term costs are justified under the circumstances. The City has stated without contravention that its short-term, interim solution will entail capital costs of at least $125 million and operating costs of $12 to $15 million per year—in contrast to

ocean dumping, which imposes virtually no capital costs and annual operating costs of only $3 million. The present record therefore strongly suggests that EPA believes that the ocean must be protected—even from low risks of degradation—at *any* cost, and even if significant resulting improvement at the dumpsite cannot reasonably be expected. Under the circumstances of this case, EPA's conclusions as to the need for dumping are arbitrary.

### 3. *Environmental Effects of Alternatives*

The 1972 Act expressly requires EPA, in formulating its criteria, to consider "the probable impact of requiring use of such alternate locations or methods upon considerations affecting the public interest." 33 U.S.C. § 1412(a)(G). The Agency has at various times recognized its obligation to consider the environmental effects of the alternatives that it forces permit applicants to adopt. In its environmental impact statement on the revised regulations, EPA promised to decide permit application "by balancing the results" of the various subparts, in order to satisfy "the broad balancing required by the statute." EIS at 137. EPA described its permit-evaluation process as complying with this requirement:

> Subparts C, D, and E explicitly state the factors to be considered in evaluating ocean dumping permit applications, other than those of environmental impact, which are incorporated in Subpart B. *The final determination in each case will be made by balancing all of the factors stated in the criteria*, including environmental impact, as well as the factors listed in Subparts C, D, and E.

*Id.* at 93 (emphasis added). Similarly, in response to a resolution of the Water Pollution Control Federation that suggested that ocean dumping "be compared with other disposal methods in determining which disposal method is most acceptable," *id.* at H–444, EPA stated that the resolution "appears to reflect the same broad considerations on which the criteria were developed, and calls for the same balancing of overall impacts incorporated into the final criteria," *id.* at H–447.

In the Administrator's evaluation of Philadelphia's permit application, he acknowledged:

> Congress, of course, recognized that any decision regarding disposal of wastes cannot be made solely on the basis of the harm such disposal causes to one portion of the environment. The probable impact of alternative methods or locations of disposal, such as land based alternatives, must also be considered. Risks must be balanced to insure that the overall public interest is served.

*Philadelphia Decision* at 5.

Yet EPA has done little to implement its obligation to consider alternatives either during the process of establishing the deadline or in evaluating the City's application for a permit. In promulgating its final criteria, EPA declared that "[i]t would be improper to adopt a cessation date which has little factual foundation. Increasingly, EPA has become aware that the alternatives to ocean dumping require careful evaluation; they may not always be better." 42 Fed.Reg. 2464 (1977). Despite this avowed awareness of the need to examine alternatives, however, EPA adopted a regulatory scheme that dispensed with the need to examine the effects of alternatives, upon a showing of a mere possibility of adverse impact.

The record of EPA's 1977 rulemaking reflects a failure to consider in a meaningful way the consequences of alternative disposal methods. The discussion in the environmental impact statement of "Impacts on Other Parts of the Environment" occupies two pages and is so cursory as to be meaningless. EIS at 149–50. The Agency's conclusion, moreover, was noncommittal: "Thus, if the criteria are applied in such a fashion as to force dumpers out of the ocean into less environmentally acceptable alternatives, there may be adverse impacts on other parts of the environment as a result of using these alternatives." *Id.* at 150.

One public commentator on the regulations warned of the dangers of replacing ocean dumping with land disposal and suggested: "Therefore, land disposal should be analyzed to the same degree of detail as marine disposal. Until this is accomplished, the environmental and economic trade-offs between . . . ocean disposal versus 'controlled' land disposal cannot be compared." *Id.* at H–207. EPA responded cavalierly:

We agree with the comment·that the impacts of land disposal should be considered to the same degree of detail as marine disposal in an overall waste management program. This document, however, deals with ocean dumping criteria, not with land disposal criteria; consequently, the emphasis is on marine environmental impacts rather than with land disposal impacts.

*Id.* at H–209. Similarly, another commentator urged that "consideration should also be given to the long-range effects of alternatives." *Id.* at H–223. The Agency replied:

The consideration[s] in this particular section of the criteria [§ 227.20(a) ]·are limited to the impacts of the ocean dumping itself, not on other uses of the ocean. We do not believe it is appropriate at this particular place to consider the long-range effects of alternatives on other parts of the environment. . . .

*Id.* at H–229. Thus, in formulating the criteria, EPA gave virtually exclusive attention to the actual and potential effects of dumping on the ocean, while ignoring the potential consequences of land-based alternatives.

The interim plan that EPA seeks to force the City to implement reflects the dangers inherent in EPA's ocean-oriented approach. The proposal, developed by a consulting firm retained by the City, involves the use of eighteen industrial centrifuges to dewater the City's sludge to about 18% solids. The relatively dry sludge is then to be composted together with other bulking materials, and the compost is to be used as ground-cover and topsoil on various public lands. Because composting will not be feasible for some time, the relatively dry sludge will have to be stored at various locations, with storage space expected to run out by June 1982. The limited availability of suitable public lands, and the environmental effects of the sludge, led the City's consultant to caution that the composting plan could be used at most for seven years. Therefore, the City would have to develop a long-range alternative by the late 1980's. Although the City believes that a feasible long-term solution will eventually be developed, it is greatly concerned about the potentially adverse effects, and the enormous cost, of the interim plan.

The dangers perceived by the City stem largely, but not exclusively, from the same heavy metals that EPA has concluded pose an unacceptable hazard to the ocean environment. Whereas dumping of these metals will, at worst, have an adverse effect upon an area of the ocean that appears to be beyond immediate reclamation, direct application of these substances on land might forever preclude agricultural use of that property, given that the concentrations of heavy metals in the City's sludge far exceed the standards established by the United States Department of Agriculture for the use of such sludge on agricultural lands. *See* McCardle Affidavit ¶ 19. The City's consultants and other scientists, moreover, have warned of the potential dangers of composting land with high concentrations of heavy metals. They note that placing lead on City lands might increase the already high amounts of that metal to which urban residents—particularly children—are exposed. Other heavy metals pose similar dangers. In addition, organic compounds in the sludge (such as PCB's and DDT) may well find their way into human foods or water supplies through plant and animal consumption or through runoff or underground water. A Cornell University study commissioned by EPA apparently has concluded that the dangers of applying composted sludge to open lands have not adequately been studied. McArdle Affidavit ¶ 23.

EPA belittles these dangers. It notes that the interim plan was studied by the City's consultant and that the study (submitted in September 1978) included an Environmental Assessment Statement ("EAS") evaluating the environmental impacts of the composting and land-application process. Although the plan identified several potential dangers, particularly in land application, EPA stresses that the EAS concluded that in theory the interim sludge-management plan posed no serious environmental hazard and that mitigation measures were available to deal with the hazards of composting and land application. *See* Affidavit of Daniel Sullivan (Chief, Environmental Inputs Branch, EPA Region II) ¶¶ 5, 6. Based upon its review of the EAS, the EPA Regional Office in New York issued a "finding of no significant impact/environmental assessment" ("FNSI/EA") for the first phase of the sludge-management plan. As EPA itself carefully notes in its submission to this Court:

> Although the FNSI/EA discussed the entire plan, including ultimate disposal utilizing land application, only the construction and operation of the proposed dewatering equipment received final approval. The FNSI/EA of June 18, 1979 represents a preliminary determination by EPA that the proposed land disposal will be environmentally acceptable. A final determination of no significant impact will not be made until the details of the site selection, design, operation and monitoring procedures are finalized by the City and approved by EPA, Region II.

*Id.* ¶ 7.

To compensate for its inability to implement its original plan by December 31, 1981, the City submitted a revised plan on July 1, 1980. The revised plan, which involves only interim disposal, eliminated several controversial disposal sites and accelerated design and construction. In August 1980, the City submitted a plan, prepared by its consultant, that addressed in greater detail the necessary steps in selecting land-application sites "to assure that the proposed sites pose no threat to public health and the environment." The new report proposed "detailed procedures for applying composted sludge at the selected sites and specified monitoring of ground water and surface water to assure that no public health, leachate or runoff problems develop." *Id.* ¶ 8. On August 29, 1980, EPA Region II issued a FNSI/EA on this submission. This FNSI/EA gave what EPA itself terms "conceptual approval" to the land application of digested, dewatered, and composted sludge. *Id.* ¶ 9. The Agency argues that it has given considerable thought to this problem, that many "mitigation measures" exist "to avoid or minimize adverse impacts," and that it has committed itself to review the plans as they are further developed and implemented; therefore, EPA concludes, the plan is an adequate basis upon which to order the City to stop dumping, and an assumption of significant danger to the public from the disposal is unwarranted. *Id.* ¶ 10.

EPA's casual approach in evaluating potential adverse impact from land-based disposal is in stark contrast to its approach in evaluating the impact of ocean dumping. In assessing the dangers of ocean dumping, EPA has stressed the potential hazards posed by heavy metals and other materials, their capacity to bioaccumulate, their impact on shellfish and other organisms, and the desirability of preventing their discharge even into an area so polluted that discernible improvement in conditions might not be achieved for many years to come. In assessing the dangers of land disposal, by contrast, EPA stresses the means by which adverse effects could be minimized and assures that it could halt the disposal program if unanticipated effects were discovered. EPA's confidence in anticipating and controlling environmental hazards is questionable, especially since the compost will contain many of the same hazardous substances contained in sludge, in a concentrated form and placed on restricted urban plots. Given EPA's grave concern over the dangers that these waste materials pose to the ocean, EPA should have evinced greater caution as to the dangers of spreading this material on topsoil in New York City.

The Agency has made only preliminary efforts to determine the suitability of the proposed land-application sites, their drainage characteristics, their proximity to water bodies or human activity, or the groundwater level below them. It has made no final determination as to whether test wells or other measures can effectively monitor all potential dangers, or whether such devises will be effective enough to avoid irreversible or long-term damage to critical aquatic or human environments. Finally, the Agency apparently has not even contemplated which level of government would be held responsible for any damage caused by the plan: the City has submitted the plan pursuant to EPA mandate, but disowns its; the State of New York, insofar as the Court is aware, has not commented on the plan; and EPA treats the plan as the City's proposal, submitted in response to the City's responsibility to dispose of its sludge somewhere other than in the ocean.

Congress did not contemplate such a procedure. The 1972 Act required consideration of the environmental effects of land-based alternatives as part of the permit-issuance process. Under the Act, the Agency must ascertain the consequences to the human environment before it denies a permit. It cannot reasonably perform this required evaluation without obtaining essential and available information, such as soil analyses, topographical data, and demographic information on human activity near the proposed locations. In this case, EPA does not claim to have concluded that land-based disposal would be less harmful to the environment than is ocean dumping; rather, EPA has merely promised to identify adverse consequences of the composting plan as quickly as possible. The Agency's findings relate to preliminary aspects of the City's plan; little evidence has been compiled on the other aspects of the plan. On the record, EPA has in effect embraced a substantial risk that, having forced the City to terminate ocean dumping, it will discover after several years (and the expenditure of hundreds of millions of dollars) that the land-disposal scheme is unacceptably dangerous to the environment and to human health. Under these circumstances, EPA's conclusion that the City's dumping would unreasonably degrade the ocean environment is arbitrary and capricious.

## IV. THE 1977 AMENDMENT TO THE MPRSA

In November 1977, Congress amended the MPRSA to preclude the Administrator from permitting ocean dumping of sewage sludge after December 31, 1981. 33 U.S.C. § 1412a(a). EPA insists that, irrespective of the propriety of the Agency's position under the 1972 Act, this amendment bars it from considering the City's claims. EPA finds in the amendment an unambiguous directive to enforce the 1981 deadline against all dumping of sewage sludge that violates the Agency's environmental impact criteria (as published on January 11, 1977, 42 Fed.Reg. 2476–82 (1977)). This legislative determination must be respected, EPA insists, for the same reason that the Supreme Court deferred to Congress' will in *TVA v. Hill*, 437 U.S. 153, 194–95, 98 S.Ct. 2279, 2301–02, 57 L.Ed.2d 117 (1978)—namely, that it is not the judiciary's function to decree "reasonable" results in the face of absolute legislative prohibitions.

The 1977 amendment cannot be disposed of so easily as EPA suggests. Although the amendment imposes an absolute deadline of December 31, 1981 for dumping of municipal sludge, it specifically defines "sludge" as material that "unreasonably degrades" the ocean environment. The amendment's legislative history firmly establishes that Congress meant to incorporate into the amendment the same concept of reasonableness adopted in the original Act. The decision in *TVA v. Hill* is therefore inapposite; here, Congress has explicitly prescribed an end only to *unreasonable* degradation—not an end to dumping irrespective of its consequences.

### A. The Statutory Language

The 1977 amendment provides that the Administrator "shall end the dumping of

sewage sludge into ocean waters ... as soon as possible after November 4, 1977, but in no case may the Administrator issue any permit ... which authorizes any such dumping after December 31, 1981." 33 U.S.C. § 1412a(a). Were this the entire text of the amendment, then EPA's construction would be sound. But this is not the entire text of the amendment, for it goes on to define sewage sludge as municipal waste "the ocean dumping of which may *unreasonably* degrade or endanger human health, welfare, amenities, or the marine environment, ecological systems, or economic potentialities." *Id.* § 1412a(b) (emphasis added). Had Congress intended to require an absolute end to all ocean dumping, the final portion of the amendment would have been unnecessary; Congress would simply have defined sewage sludge as the product of municipal wastewater treatment. Instead, Congress proscribed the dumping only of sludge that would unreasonably degrade the environment.

The 1977 amendment is wholly consistent with the original section 1412. Both provisions are governed by the identical standard—unreasonable degradation. *Cf. Chugach Natives, Inc. v. Doyon, Ltd.*, 588 F.2d 723, 725 (9th Cir. 1978); *United States v. Nunez*, 573 F.2d 769, 771 (2d Cir.), *cert. denied*, 436 U.S. 930, 98 S.Ct. 2828, 56 L.Ed.2d 774 (1978). The amendment does not purport to modify in any way the factors that section 1412(a) required EPA to consider in determining whether dumping would unreasonably degrade the environment; it simply provides that EPA may not, after 1981, permit dumping that fails the test established by the 1972 Act. Unlike EPA's construction of section 1412a, which contradicts section 1412, the straightforward construction suggested by the amendment's language harmonizes the two provisions. *Cf. Administrator, FAA v. Robertson*, 422 U.S. 255, 265–66, 95 S.Ct. 2140, 2147–48, 45 L.Ed.2d 164 (1975); *Montgomery Charter Service, Inc. v. Washington Metropolitan Area Transit Commission*, 325 F.2d 230, 234 (D.C.Cir.1963). The language of the 1977 amendment clearly incorporates

the principle of reasonableness and must therefore control the statutory construction. *See TVA v. Hill, supra*, 437 U.S. at 184 n.29, 98 S.Ct. at 2296 n.29.

EPA might argue that Congress must have meant to accomplish something new in adopting the amendment, not merely to duplicate its original directive. But the ready answer is that Congress needed to repeat its 1972 directive because EPA had improperly utilized the interim permit to allow some municipalities to dump sludge without ensuring that such dumping would not unreasonably degrade the ocean environment. Congress wanted an absolute end to such dumping no later than December 31, 1981, as the legislative history clearly reflects.

### B. *Legislative History*

EPA contends that the legislative history of the 1977 amendment demonstrates that it was intended to end sludge dumping by New York City and other municipalities. The Agency relies upon a statement in the Report of the House Committee on Merchant Marine and Fisheries that in effect adopts EPA's environmental impact criteria as the test of unreasonable degradation:

> In determining whether sewage sludge may "unreasonably degrade or endanger ..." the Administrator of EPA shall apply the criteria which were established by such agency in the Federal register on January 11, 1977. If the sewage sludge to be dumped does not satisfy such criteria, it shall be deemed by the Administrator to fall within the definition of "sewage sludge" as set forth in section 4 of this bill....

House Report No. 95–325 (Part 1), 95th Cong., 2d Sess. (1977), *reprinted in* [1977] U.S.Code Cong. & Ad.News 3262, 3264 [hereinafter cited as 1977 House Report]. EPA argues that this statement requires it to halt by the end of 1981 all dumping that does not satisfy the environmental impact criteria issued on January 11, 1977; because the City's sludge fails to satisfy Subpart B, the Agency lacks the authority to issue a permit for post-1981 dumping. EPA contends that this passage also establishes be-

yond question the legality of EPA's impact criteria: whatever Congress meant in 1972, the administrative criteria were raised to the level of statutory command by the 1977 amendment. Finally, EPA adds, New York City's efforts to convince Congress to alter that result have failed.[22]

EPA's construction of the amendment is far too sweeping. It would freeze, and place beyond administrative and judicial review, a set of regulations containing many interim provisions, in an area of scientific flux. The amendment's history gives no hint of such an extraordinary purpose. Rather, the legislative history indicates that Congress sought to end EPA's issuance of interim permits to municipalities merely because they had been found to be acting in good faith. The history of the 1977 amendment also suggests that EPA must determine, in connection with all interim permit holders, whether their proposed dumping qualifies for a special permit. Although a few members of congress voiced adament opposition to the City's dumping and agreed with EPA's impact criteria, neither the legislative history nor the criteria themselves support the argument that the criteria were incorporated in their entirety. EPA has been left with ample power to amend and modify the criteria, and the courts remain obliged to exercise their normal function of assuring that agency action is not arbitrary, capricious, an abuse of discretion, or otherwise inconsistent with law.

The scant legislative attention given to the amendment strongly suggests that Congress did not intend conclusively to approve EPA's impact criteria. The 1977 amendment was added by the House Committee on Merchant Marine and Fisheries during its deliberations on a funding authorization for the Act. The Senate Committee report, Senate Report 95–189, 95th Cong., 2d Sess. (1977), did not discuss the provision, and the amendment received little scrutiny on the floor of either house.

Congress was undoubtedly concerned in 1977 about EPA's excessive leniency in authorizing continued ocean dumping of municipal sewage sludge. The House Report explained:

> The Merchant Marine and Fisheries Committee has not been satisfied with EPA's progress in curbing harmful ocean dumping. In particular, the Committee is concerned with EPA's reluctance to establish firm phase-out dates for harmful ocean dumping and, more importantly, with EPA's continued sanctioning of the ocean dumping of materials—such as sewage sludge—which cannot meet EPA's own Ocean Dumping Criteria. In response to this concern, the committee believes it is necessary to codify EPA's stated goal of ending the ocean dumping of sewage sludge which is harmful to the marine environment or to human health, welfare, and amenities.

1977 House Report, U.S.Code Cong. & Admin.News 1977, at 3264. In particular, the House Report noted that "EPA's ocean dumping regulations include a permit classification termed 'interim permits,' which allows wastes not meeting the established criteria to be dumped into the ocean." Echoing the views of Committee members Leggett, Breaux, and Forsythe, the Report noted: "The committee questions the legal authority of EPA to issue interim permits at all under the 1972 act." *Id.* at 3263–64.

At hearings before the House Subcommittees on Oceanography and Fisheries, and on Wildlife, Conservation and the Environment, data were introduced concerning EPA's use of the interim permit. At that time, scores of interim permits had been issued to municipalities. These interim per-

---

22. EPA also refers to a statement in a subsequent House authorization report as supporting its interpretation. Defendant's Memorandum at 35. The statement in question is itself ambiguous. Moreover, such subsequent legislative statements cannot control the meaning of a previously enacted law. *See, e.g., TVA v. Hill,* 437 U.S. 153, 189-93, 98 S.Ct. 2279, 2299-01, 57 L.Ed.2d 117 (1978); *SEC v. Sloan,* 436 U.S. 103, 121–23, 98 S.Ct. 1,702, 1713–14, 56 L.Ed.2d 148 (1978); *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974); *National Nutritional Foods Ass'n v. Mathews,* 557 F.2d 325, 335 n.7 (2d Cir. 1977).

mits were liberally issued on a showing of financial hardship or of good faith efforts to obtain necessary funding. Even as the amendment was being considered, EPA opposed it on the ground that "there could be funding delays [for some cities] ... that would justify short extensions of the 1981 compliance date." 1977 House Report, U.S. Code Cong. & Admin.News 1977, at 3273–74 (quoting letter from EPA). This excessive liberality led Congressman Hughes to propose in subcommittee an amendment that would have prohibited "the dumping of any sewage sludge into ocean waters after December 31, 1981." EPA would have been permitted to prohibit such dumping prior to that time, moreover, "if the Administrator found that the sewage sludge would unreasonably degrade" the ocean environment. 1977 House Report at 3263. The subcommittee unanimously adopted this proposal.

The full Committee on Merchant Marine and Fisheries, however, was unwilling to adopt the Hughes proposal. Representative Breaux suggested that the Hughes amendment be deleted from the pending appropriation measure. Representative Hughes retreated; in place of his original proposal, he offered the amendment ultimately enacted, "so as not to prohibit the dumping of all sewage sludge after 1981, but only sewage sludge which may unreasonably degrade the marine environment." The amendment still troubled some committee members, but it was adopted and ultimately enacted. *Id.*

The subsequent legislative history, although rather spare, establishes that Congress—like the Committee—was determined to prevent EPA from extending the deadline for improper reasons, but at the same time did not intend for the deadline to apply to sludge that would not unreasonably degrade the ocean environment. 1977 House Report at 3264.

Several legislators expressed concern that municipalities would be reluctant to under-

take the expenditures necessary to replace ocean disposal. The few comments on the amendment emphasized that financial excuses were insufficient grounds for permitting dumping after the deadline. Senator Sarbanes's comments were typical:

> [I]f the dumping of sewage sludge offshore ... is to be halted, a deadline must be established. Many of the municipalities now dumping have not undertaken, in a serious way, the effort to find alternative disposal methods for the increasing amount of sewage sludge which they are generating. Since ocean dumping remains a cheap way to dispose of this sludge, there will be great pressure to keep dumping it in the ocean after any administratively set deadline. The 1981 deadline for all dumping of harmful sewage sludge will provide clear notice that these municipalities will have to develop alternatives so that ocean dumping will end once and for all.

123 Cong.Rec. S 17,420 (daily ed. Oct. 20, 1977).[23]

On the other hand, legislators also made clear that they intended to allow dumping that was not unreasonably degrading to continue. Of particular significance is a colloquy on the Senate floor, in which one of New York's Senators specifically addressed the City's situation:

> *Senator Moynihan.* Mr. President, there are coastal cities that have few alternatives to the deposition of sewage sludge in the ocean. New York City is one of them: It simply does not have presently available alternatives to ocean dumping; nor, do I expect it to have an alternative by December 31, 1981, the deadline imposed by this act.
>
> In cases such as this, a municipality should be afforded the time to find a viable alternative to ocean dumping. It is my understanding that section 4(b) [33

**23.** Representative Leggett (Chairman of the Subcommittee on Fish and Wildlife) stated: "A large part of the opposition to the termination of ocean dumping stems from the fact that it remains the cheapest means of disposing of municipal waste." 123 Cong.Rec. H 11,022

(daily ed. Oct. 14, 1977). Representative Hughes stated: "[S]o long as ocean dumping remains the cheapest and most convenient means of disposing of sludge, there will remain a tremendous pressure to continue dumping." *Id.*

U.S.C. § 1412a(b) ] would provide such an extension beyond the deadline. Section 4(b) defines the term "sewage sludge" with respect to the anticipated impact of its dumping on "human health, welfare, amenities, or the marine environment, ecological systems, or economic potentialities." *If the Administrator finds that the ocean dumping of waste does not unreasonably affect any of these characteristics of the water, then he may grant an extension beyond the date in section 4(a).* Is my understanding correct?

*Senator Muskie. Yes, the Senator's interpretation of the act is correct.* However, I must stress to the Senator from New York, that the test in the bill is a strict one. The sludge may not have a deleterious effect on the marine environment. The key word in section 4(b), open for the Administrator's interpretation, is "unreasonably."

123 Cong.Rec. S 17,420 (daily ed. Oct. 20, 1977) (emphasis added). Although Senator Muskie's response stressed that the standard for permitting dumping was stringent, he agreed that New York City would be entitled to attempt to prove that its sludge did not unreasonably degrade the ocean environment, and he expressly stated that it was open to EPA to interpret what is "unreasonable." [24]

Had Congress meant to adopt EPA's impact criteria (as published in January 1977) as a statutory standard, then the Senate floor manager presumably would have known that. Moreover, that decision would have been made only after some evaluation of the adequacy of the impact criteria. As applied to sludge, for example, EPA itself recognized that the impact criteria were inadequate at the time of the amendment's

adoption. The criteria specify bioassays as the proper technique for evaluating adverse impact; but in 1977, no bioassays had been developed for materials in the suspended-particulate phase, the phase in which sewage sludge must be evaluated. Bioassay techniques for the suspended-particulate phase were not available until mid-1978. *See* 43 Fed.Reg. 28,249 (1978). Congress could not have meant either to preclude EPA from developing proper bioassays for evaluating sludge, or to prevent sludge that passed such bioassays from qualifying for special permits. Indeed, the House Committee that proposed the 1977 amendment also stressed the need for EPA and NOAA to improve their knowledge of the effects of dumping on the ocean, so as to facilitate scientifically sound decisions concerning the allocation of ocean resources. 1977 House Report at 3276–79.

The impact criteria themselves demonstrate, moreover, that Congress could not have meant to ban all dumping previously conducted pursuant to interim permits. The 1977 criteria are expressly based on the premise that interim permits would be available as to device to enable EPA to adopt stringent impact standards for the issuance of special permits. As EPA acknowledged, the interim permit was often used to force an end to potentially dangerous dumping, even if the dumping was not unreasonably degrading. Absent the interim-permit device, EPA suggested, the impact criteria for special permits would necessarily have been less rigorous. When Congress adopted the amendment barring further use of the interim permit, therefore, it could not reasonably be said to have required the Agency to deny any form of

---

**24.** EPA's discussion of the colloquy illustrates the Agency's determination to find in the amendment authority to implement a policy that it had already adopted in its final regulations. Thus, EPA argues that the colloquy "is at clear odds with the plain meaning of the statute. Section 4(b) ... simply defines the material which, according to Congress' direction, could not be dumped after 1981." Defendants' Memorandum at 32 n.*. But the colloquy conflicts with the statute only if EPA's reading of the statute is correct. EPA also

argues that "Senator Moynihan's remarks are of limited assistance to the City in this case, as he was primarily concerned with the possibility ... that the City would have no viable alternative to dumping by the end of 1981. That, however, is not the case." *Id.* EPA thus uses its conclusion that the land-based disposal is acceptable, to justify its refusal to hear the City's evidence that the interim land-based alternative is more hazardous than continuing ocean disposal until an acceptable alternative is devised.

permit to all prior holders of interim permits; that is, Congress did not preclude the reappraisal of impact criteria for special permits that EPA warned would be necessary if interim permits could not be issued. Rather, Congress required EPA to review all future applications for special permits under criteria that EPA would find proper in the context of a regulatory scheme bereft of interim permits. It is extremely doubtful that Congress would have eliminated the administrative safety-valve and at the same time would have frozen forever impact standards whose stringency was premised on the existence of that safety-valve. EPA has presented no persuasive evidence that such was Congress' intent.[25]

Similarly, in adopting the 1977 amendment, Congress made no effort to evaluate EPA's determinations that land-based alternatives would be technologically feasible for all cities after 1981, or that the alternative developed for New York City was environmentally acceptable. EPA stated in comments accompanying its January 1977 regulations that its 1981 deadline reflected the determination that all dumpers would by that time be able—both technologically and practically—to develop suitable alternatives. At that time, moreover, although the City opposed the deadline, it believed that it could comply with the deadline. Consequently, it is not surprising that Representative Leggett (Chairman of the Subcommittee on Fish and Wildlife), although skeptical, assumed that a land-based alternative existed for New York City's dumping:

The New York situation is apparently somewhat more pessimistic. The problem there is insufficient surface area for composting and insufficient funds to develop land-based alternatives. Nevertheless, the *Assistant Administrator for the Environmental Protection Agency testified . . . that sufficient alternative[s] did exist for New York, and that the deadline could be met.* Further, the administrator of New York City's Environmental Protection Administration indicated that New York was determined to meet the 1981 date.

123 Cong.Rec. H 11,022 (daily ed. Oct. 14, 1977) (emphasis added). When the House Committee stated that it "is losing confidence in EPA's ability to compel municipalities, which now dump their sewage sludge into ocean waters, to adopt *environmentally acceptable* land-based alternatives," 1977 House Report, U.S.Code Cong. & Admin. News 1977, at 3265 (emphasis added), it certainly assumed that acceptable alternatives existed. Senator Moynihan questioned this assumption, and Senator Muskie agreed the issue was open for EPA's consideration.

The legislative history of the 1977 amendment thus does not support EPA's position in this litigation.[26] Congress adopted that amendment to halt EPA's practice of issuing permits for the dumping of unreasonably degrading materials on grounds of local economic hardship. Congress did not in-

---

**25.** Although EPA claims that the amendment froze the regulations, it contended at oral argument that it retains the authority to alter the critical requirements used in enforcing the environmental impact criteria, such as bioassay techniques and the concentrations of substances in sludge from which a conclusive presumption of unreasonable degradation would be inferred. If EPA's position were accepted, the Agency would be left free to manipulate the Act at will by defining which concentrations are unacceptably harmful. EPA seeks in effect, to disclaim any discretion to alter the standards, while at the same time retaining the power to set any standards it wants by revising its enforcement manuals.

**26.** EPA argues that Congress's refusal to amend the Act in 1979 and 1980, despite the

City's requests, "provides a clear mandate from Congress that sewage sludge that does not meet the standards established by the Agency's regulations not be dumped after December 31, 1981." Defendants' Memorandum at 36. No such conclusion can be drawn, since the matter was not presented to either house, but only to one House subcommittee, the members of which might hold views far different from those reflected in the amendment's language and pre-adoption history. Courts have frequently discounted subsequent committee actions in interpreting statutory provisions. *See, e.g., United States v. Southwestern Cable Co.*, 392 U.S. 157, 170, 88 S.Ct. 1994, 2001, 20 L.Ed.2d 1001 (1968); *Wisdom v. Norton*, 507 F.2d 750, 767 (2d Cir. 1974).

tend to chisel the environmental impact criteria of Subpart B into stone; in fact, the legislators did not even scrutinize those criteria. EPA seeks to draw too much comfort from a single paragraph of the House Report. As two observers of the Agency recently commented in another, but related, context:

It is only by insisting on explicit statutory language that courts can assure themselves that the committee report represents more than a successful effort by a handful of insiders to exploit the overloaded congressional docket. The regular application of this *principal of textual priority* will, over time, bring home to the staff and lobbyists on Capitol Hill that there is only one way to force an agency to do their bidding—and that is to engage in the full debate traditionally associated with explicit statutory amendment.

Ackerman & Hassler, *Beyond the New Deal: Coal and the Clean Air Act*, 89 Yale L.J. 1466, 1560 (1980) (footnote omitted). Congress did not review the agency regulations and then adopt the 1977 amendment in order to lend those regulations statutory authority. *Cf. Mitchell v. Commissioner of Internal Revenue*, 300 F.2d 533, 538 (4th Cir. 1962). Rather, the 1977 deliberations were concerned with ending excessive EPA leniency.

The deficiencies in EPA's approach discussed in this opinion have recently been confirmed by the National Advisory Committee on Oceans and Atmosphere ("NACOA"), after a two-year study of the use of the oceans for waste disposal. NACOA, *The Role of the Ocean in a Waste Management Strategy: A Special Report to the President and the Congress* (Jan.1981) [hereinafter cited as *NACOA Report*]. NACOA is an expert advisory committee created by Congress in 1977. Pub.L.No. 95–63, 91 Stat. 265 (1977). In its reasoned and coherent report, NACOA stressed the need for development of a sound, multimedium approach to the problem of waste disposal. NACOA criticizes several aspects of EPA's regulatory scheme for sludge dumping. First, NACOA rejects EPA's interpretation of the MPRSA and the 1977 amendment; the statute, according to NACOA, bans only dumping that would unreasonably degrade the ocean, and that determination must be based upon full consideration of the costs and environmental consequences of alternative disposal methods. *Id.* at 99–100. Second, NACOA urges reversal of the "EPA policy that no ocean dumping permit will be issued when any land-based alternative exists"; EPA should not only determine whether an alternative is technologically feasible, but should also ascertain the relative costs of ocean versus land-based disposal. *Id.* at 94. Finally, NACOA calls for thorough analysis of the environmental impact of land-based disposal, concluding that "the oceans should be utilized for the disposal of certain wastes, if land disposal, deep-well injection, or incineration would more significantly degrade the environment or pose a greater risk to human health." *Id.* at 98. These conclusions are not entitled to any special deference; although the facts upon which they are based are largely undisputed, EPA has not as yet commented upon the report. Nevertheless, the report lends additional support to this Court's own conclusions.

EPA's refusal to consider the City's claims as to the potential dangerousness of land-based disposal is typical of what NACOA characterized as the Agency's "medium-by-medium approach" to waste disposal. That approach creates inconsistent results under the various environmental statutes that EPA administers, and it prevents the Agency from minimizing the overall risk to human health and the environment posed by waste disposal. *Id.* at 92–98. EPA's failure definitively to consider and make findings concerning the City's fears appears to conflict, for example, with the Agency's duties under the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901–6987, since the cadimium levels in the City's sludge might well preclude land disposal in light of that statute's requirements. *See* NACOA Report at 30. EPA cannot discharge this duty by simply relying on any assurance that might have been given by the City as part of the City's obligation to

proceed with the sludge disposal plan, especially since the assurance appears to have been implicitly withdrawn.

EPA has overreacted to the Congressional chastisement of it in 1977. The Agency has swung from one extreme, at which it was overly lenient in permitting dumping because of financial considerations, to the opposite extreme, at which it refuses to permit dumping even if it may be the method of disposal least damaging to the environment. EPA seeks to shield its unreasonable policy by blaming it on Congress: "if the City is in fact in a 'Catch 22' situation, . . . it is Congress, not the Agency, that has placed it there." Defendants' Memorandum at 34. But such arbitrariness will not lightly be imputed to the Congress. It is inconceivable, in light of the legislative history, that Congress can be said to have forbidden EPA from granting the City a permit to dump sludge upon a showing that land disposal would be more damaging than ocean dumping to the environment and to human health.[27]

Accordingly, the City is entitled to the entry of summary judgment in its behalf. The final order must recognize that the 1981 deadline remains intact, but only for dumping that EPA determines—pursuant to criteria that genuinely consider all of the relevant statutory factors—will unreasonably degrade the environment. Similarly, it will be for EPA to determine in the first instance the validity of the City's claims as to the environmental consequences of ocean dumping versus land-based disposal of its sludge. This decision holds only that EPA must provide the City with an opportunity to present those claims and must decide those claims pursuant to criteria that require consideration of all of the statutory factors relevant to a reasoned determination.

SO ORDERED.

**27.** Subsequent to the issuance of the original opinion in this case, the Court of Appeals for the District of Columbia Circuit reached a similar conclusion as to EPA's erroneous interpretation of the Act. *Natural Resources Defense Council, Inc. v. EPA*, 656 F.2d 768, at 782–783. (D.C.Cir.1981).